# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

JAMES HARBOLT,

                Plaintiff,

v.                                 CIVIL ACTION NO. 3:07-0661

STEEL OF WEST VIRGINIA, INC.,
a Delaware Corporation,

                Defendant.

> **VACATED PURSUANT TO THE [77] ORDER ENTERED 6/17/2009.**

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Steel of West Virginia, Inc.'s Motion for Summary Judgment (doc. 41) and Motion to Strike (doc. 72) . For the following reasons, the Court **GRANTS** these motions.

## I. FACTS

As an initial matter, the Court observes that Plaintiff's Memorandum in Support (doc. 46) of his response to Defendant's Motion for Summary Judgment contains numerous citations to portions of Plaintiff's depositions that have not been made a part of the record. Plaintiff has been warned repeatedly throughout this case regarding the need to introduce evidence in support of the factual assertions made in his memorandum, if he wished for the Court to consider them. The Court previously telephoned Plaintiff's counsel's office and alerted them to the problem of the cited but absent evidence, as well as factual assertions that Plaintiff did not purport to substantiate with citations to the record. At the pretrial conference held on March 23, 2009, Plaintiff's counsel was reminded that the record had not yet been supplemented with evidence to support all of his factual

assertions, notwithstanding the Court's prior discussion with his office.  In an order entered later that day, lest there be any doubt as to Plaintiff's responsibilities, the Court directed Plaintiff to file immediately all evidence cited by Plaintiff in his memorandum.  Both the word "directs" and "immediately" appeared in bold print.  "Directs" also appeared in all capital letters.  Plaintiff ignored the Court's Order and failed to offer evidence in support of all of his factual claims.

Some three weeks after the entry of the March 23 Order, Defendant, quite understandably, filed a Motion to Strike (doc. 72) Plaintiff's unsupported factual assertions.  Plaintiff did not deign to respond to this motion.  Therefore, the Court **GRANTS** the motion.  While the Court considers the facts in the light most favorable to Plaintiff, such consideration is limited solely to facts supported by citations to evidence that has been made a part of the record.  The Court now turns to a recitation of the facts of this case, which is accordingly somewhat limited.

Defendant hired Plaintiff to work as a laborer in 2002.  Plaintiff was also a member of the Local 37 Steelworkers union.  On October 27, 2005, Plaintiff was operating the saw on the universal mill, or U-mill, through which steel bars pass for final cleaning and straightening.  Plaintiff's job was to make sure that the "guides" on the U-mill were functioning properly.  A problem developed with the guides, and someone instructed Plaintiff to change them.  Plaintiff claims that, while performing this task, he slipped on a greasy floor and slid or landed three to four feet under the U-mill, but was able to catch himself prior to falling into a pit located beneath it.  Plaintiff states he injured his back and knee in the fall.  According to Plaintiff, there were "gobs of grease" on the floor, so much that "sometimes you can scoop it up with a shovel," because it "flies off" the bearings of the U-mill.  *October 17, 2008 Deposition of James Harbolt*, at 74.  He further alleges that grease sometimes "splatter[ed] . . . 15, 20 feet away from [the U-mill]" and that there was grease on the floor "24/7."

*Id.* at 75. During his deposition, Plaintiff stated that the floor next to the U-mill was "an ice rink." *Id.* at 74.

Defendant primarily used power washers to remove grease from the floor.[1] These power washers were available throughout the steel mill, including the U-mill area, and were available for use by employees at any time. Plaintiff contends, however, that use of the power washers "makes [the situation] ten times worse" because the grease "mixe[s] with [the] water" and forms "a greasy residue," causing people to slip every day. *Id.* at 76, 80. Plaintiff further alleges he informed the union and Larry Black, a superintendent at the mill, "a bunch of times" about the perceived problem. *Id.* at 84. Somewhat paradoxically, however, he also complains that "[t]he floors were not power washed on a daily basis." *Plaintiff's Memorandum in Support of Opposition*, at 2.

Plaintiff returned from this injury in March or April 2006, only to suffer a second round of injuries in December of that year, this time to his shoulder, neck, and chest. Plaintiff again was unable to work. Like his first set of injuries, these injuries were also covered by workers' compensation. Plaintiff planned that he would return from his injuries in February 2007. On February 27, 2007, Plaintiff visited his treating physician, Dr. Paul Craig. Because Plaintiff had not yet had the MRI required for him to return to work, Dr. Craig was forced to continue to keep him out of work.

Defendant's Human Resources Manager, Larry Gue, contacted Dr. Craig and asked that Plaintiff be released to "light duty" work. Dr. Craig agreed and prepared light duty restrictions for Plaintiff. After receiving these restrictions, Mr. Gue contacted Dave McMellon, Superintendent of the Finish and Fabrication Department, and informed him of Plaintiff's restrictions. The two agreed

---

[1] Towels were also available for employees to wipe grease from the floor.

that Plaintiff was able to work in the office answering telephones. Mr. Gue then contacted Plaintiff and informed him that he was to report to work at the beginning of his next regularly scheduled shift, on March 2, 2007, to answer phones in the mill office.

Sometime between Plaintiff's second injury and his return on March 2, 2007, another employee for Defendant reported to management that he had previously bought approximately fifteen to twenty pain pills for seven dollars apiece from Plaintiff. This employee made similar allegations against two other employees. After an investigation revealed the other two accused employees possessed prescription narcotics in an amount sufficient to engage in the alleged sales, both were terminated. As for Plaintiff, Mr. Gue and Mr. McMellon conferred and decided that Plaintiff should be investigated upon his return to work.

Plaintiff reported to the mill office on March 2 as directed. Three others were there: Mr. McMellon; Paul Preece, a union representative; and Christopher Artrip, Manager of Defendant's Environmental Health and Safety Program. Mr. McMellon directed Plaintiff to empty his pockets. Mr. Preece asked why Plaintiff needed to empty his pockets,[2] and Mr. McMellon informed Mr. Preece and Plaintiff of the allegations made against Plaintiff. Plaintiff asked Mr. Preece if he should comply, and Mr. Preece advised Plaintiff to comply if he had nothing to hide. Plaintiff then emptied his pockets, which proved to contain no drugs. The parties dispute whether Plaintiff consented to this search. At his deposition, Plaintiff conceded that he was not physically forced to empty his

---

[2]In his memorandum, Plaintiff claims that he "asked what was going on," but it appears from the record that it was Mr. Preece that asked why Plaintiff needed to empty his pockets. *Plaintiff's Memorandum in Support of Opposition*, at 4; *see November 3, 2008 Deposition of James Harbolt*, at 31.

-4-

pockets and that he did so only after speaking with Mr. Preece. However, he also maintained that he "really had no choice." *November 3, 2008 Deposition of James Harbolt*, at 32.

Mr. McMellon then told Plaintiff he wished to search his locker, to which Plaintiff consented. On the way to the locker, Mr. McMellon informed Plaintiff that he was suspended. The locker also proved to contain no drugs. Plaintiff contends that this portion of the investigation occurred during a shift change, and was therefore witnessed by "everybody." *Id*. at 132.

Next, Mr. McMellon advised Plaintiff that he wished to search his vehicle. Plaintiff and Mr. Preece objected on the ground that his vehicle was parked across the street on a credit union's parking lot, which the pair believed was not company property. Mr. McMellon informed them that Defendant in fact owned the lot. When they arrived at the vehicle, Plaintiff stated: "Here, I don't want you in my vehicle tearing it up. I'll get [the prescription drugs]." *Id*. at 38. Plaintiff explained at his deposition that at that point he "reached in [to the vehicle] and got the prescription." *Id*. According to Plaintiff, as he was retrieving the drugs from his vehicle, Mr. McMellon opened the trunk, and perhaps a back door, and began searching on his own. Mr. McMellon then directed everyone to accompany him to Mr. Gue's office. Mr. McMellon informed Mr. Gue that Plaintiff had possessed, in his vehicle, two types of prescription narcotic drugs in quantities in excess of what Plaintiff had been prescribed to take on a daily basis. Mr. Gue then reiterated Mr. McMellon's earlier statement that Plaintiff was suspended. Initially, Mr. Gue told Plaintiff that all of his benefits were "ceased or cut or no more." *Id*. at 46. After speaking with Mr. Preece, however, Mr. Gue stated that he would "have to check on his medical or whatever." *Id*. He also kept one of each of his pills, with Plaintiff's permission, although Plaintiff claims he did not later return them as agreed.

-5-

In a letter dated April 23, 2007, Defendant terminated Plaintiff's employment. The letter gave three reasons for Plaintiff's termination. First, it claimed Plaintiff had sold drugs to a co-worker while at work. Second, it pointed out that Plaintiff had possessed, on company property, pain pills in excess of what he could consume during his shift, based on his prescription. Third, the letter observed that Plaintiff had purchased two sets of different pain pills within three days of each other in May 2006, which the letter described as "doubl[ing] up." *Declaration of Larry Gue*, Ex. 2. This letter was written by Bruce Groff, Defendant's Vice President of Administration. According to Plaintiff, Mr. Groff accused him of being a "drug dealer" and a "drug user" during his suspension and subsequent termination, through his reinstatement after the arbitration proceeding. *November 3, 2008 Deposition of James Harbolt*, at 114. Specifically, Plaintiff states that Mr. Groff made these statements during the investigation and in the termination letter. The statements were allegedly made to Plaintiff, "the union," and "the guys that [were] there [at the union hearing], . . . like McMellon and a bunch of them." *Id.* at 116. Around the time of Plaintiff's suspension, Defendant also put up a posting "that generally requested information regarding illegal drug trafficking." *Plaintiff's Memorandum in Support of Opposition*, at 6. Despite the general nature of the posting, Plaintiff stated that he felt that it "was directed to him," apparently because "other employees . . . question[ed] [him] regarding the company's allegations against him." *Id.*

Plaintiff and the other two men who had been terminated for the same alleged conduct all grieved their terminations, which Defendant denied. The union then took the terminations to arbitration, and prevailed on all of them. Each of the terminated men was reinstated with full back pay, interest, and benefits. Plaintiff returned to work in February 2008, albeit in a different

-6-

department into which he had bid. In this new department, Plaintiff has been disciplined three or four times, unfairly in his view.

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

**A. Deliberate Intent**

West Virginia Code § 23-4-2 governs "[d]isbursement where injury is . . . intentionally caused by [an] employer." A showing of deliberate intent in this case requires Plaintiff to introduce evidence in support of five facts:

> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>
> (B) That the employer, prior to injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;
>
> (C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions.
>
> (D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and
>
> (E) That the employee exposed suffered serious compensable injury or compensable death as defined in [§ 23-4-1] whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

W. Va. Code § 23-4-2(d)(2)(ii). Because the Court finds that Plaintiff has offered no evidence in support of the second and fourth elements, the Court does not consider the existence of the first, third, and fifth elements.

The second element requires prior actual knowledge of both "the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition." *Id*. § 23-4-2(d)(2)(ii)(B). Actual knowledge "is a high threshold that cannot be successfully met by speculation or conjecture." *Mumaw v. U.S. Silica Co.*, 511 S.E.2d 117, 123 (W. Va. 1998). "This requirement is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition. Instead, it must be shown that the employer actually possessed such knowledge." *Id*. Moreover, knowledge of the specific unsafe working condition alone is insufficient; rather, Defendant must "also [have] realized the 'high degree of risk and strong probability of serious injury or death presented by [the] specific unsafe working condition.'" *Ryan v. Clonch Indus.*, 639 S.E.2d 756, 765 (W. Va. 2006) (quoting § 23-4-2(d)(2)(ii)(B)).

The only argument that Plaintiff makes in relation to this element is that he complained to a management official for Defendant about the grease around the U-mill prior to his injury[3] and that his expert witness, "Dr. Winn[,] has averred that [Defendant] was aware of the problems prior to the injury." *Plaintiff's Memorandum in Support of Opposition*, at 8. However, these arguments only

---

[3]In fact, in his response, Plaintiff argued that he complained to "various" management officials about both "the grease and lack of railings around the U-mill." *Plaintiff's Memorandum in Support of Opposition*, at 8. However, because Plaintiff failed to supplement the record as requested, his claims regarding complaining to multiple officials and complaining about a lack of railings are unsupported, and the Court therefore declines to consider them.

-9-

suggest that Defendant was aware of the *existence* of the greasy floor, not that it also presented a "high degree of risk and [a] strong probability of serious injury or death," assuming of course for the sake of argument that the floor did present such a risk and probability. § 23-4-2(d)(2)(ii)(B); *see Affidavit of Gary Winn*, at ¶ 5 (stating "I believe that [Defendant] had . . . an actual knowledge of the existence of these specifically unsafe working conditions," but not positing that Defendant also was aware of a "high degree of risk and . . . strong probability of serious injury or death" associated with any unsafe working conditions). Having not made the necessary arguments, Plaintiff may not now rely on the Court to make his arguments for him.

Further, the only evidence introduced by either party on this point is Defendant's evidence suggesting that it did not view the floor as posing a high risk and strong probability of serious injury. Mr. Black (a Defendant superintendent), Mr. Artrip (Manager of Defendant's Environmental Health and Safety Program), Jared Gilliam (a Defendant shift supervisor), Carl Runyan (President of the Local 37 Steelworkers union), and Clyde Bess (a worker on the U-mill) each testified that he did not view the floor as unsafe, let alone posing a high risk and strong probability of serious injury. *See Declaration of Larry Black*, at ¶ 3 ("[Defendant] takes reasonable and appropriate efforts to remove the grease from the floor to keep the working environment safe."); *Declaration of Christopher Artrip*, at ¶ 7 ("It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors."); *Declaration of Jared Gilliam*, at ¶ 7 ("It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors. I regularly run through the mill."); *Declaration of Carl Runyan*, at ¶ 7 ("It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors. . . . I do not believe that there is a lot of

-10-

grease on the floors of the #1 Mill and around the U-Mill and do not believe that this is a safety issue or was a safety issue when [Plaintiff] was injured."); *Declaration of Clyde Bess*, at ¶ 6 (same). The Court does not recite this testimony because it demonstrates that the floor around the U-mill did not pose a high risk and strong probability of serious injury. However, it shows that, if the floor had the characteristics Plaintiff attributes to it, Defendant did not have actual knowledge of that fact. Accordingly, Plaintiff cannot prove the second element of his deliberate intent claim.

Plaintiff also cannot prove the fourth element of his claim, that Defendant intentionally exposed him to the specific unsafe working condition. "[T]his element[] . . . is linked particularly with the [second] element," and "is not satisfied if the exposure of the employee to the condition was inadvertent or merely negligent." *Sias v. W-P Coal Co.*, 408 S.E.2d 321, 327 (W. Va. 1991). In support of this element, Plaintiff only argues, vaguely, that "Dr. Winn also bolsters plaintiff's argument in this regard in his Affidavit."[4] *Plaintiff's Memorandum in Support of Opposition*, at 8. Although unclear, apparently Plaintiff refers to Dr. Winn's unsubstantiated and conclusory statement that he "believe[s] that [Defendant] . . . intentionally exposed [Plaintiff] and other workers at the U-Mill to these specifically unsafe conditions." *Affidavit of Gary Winn*, at ¶ 8. However, as Defendant correctly observes, "'[I]n order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues.'" *Defendant's Reply*, at 2 (quoting

---

[4]The Court refuses to consider Plaintiff's claim that Defendant "did nothing to address his safety concerns about the grease and slippery floor situation, and lack of a railing around the U-mill, despite his numerous complaints to management about these specific unsafe working conditions prior to his injury." *Plaintiff's Memorandum in Support of Opposition*, at 8. Plaintiff provides no citation to the record in support of this claim. While Plaintiff did cite his deposition in support of this claim in the "Statement of Facts" section of his response, which would have been sufficient for the Court's consideration had the cited pages reflected this claim, they were never made a part of the record.

8 F.3d 88, 92 (1st Cir. 1993)). Here, Dr. Winn's affidavit statement is exactly that: "a conclusory assertion about ultimate legal issues." It does not constitute evidence that Defendant intentionally exposed Plaintiff to an unsafe condition. Having failed to offer evidence of the second and fourth elements of his deliberate intent claim, Plaintiff must not be permitted to continue with it. Summary judgment is appropriate.

## B. Workers' Compensation Discrimination

### 1. West Virginia Code § 23-5A-1

West Virginia Code § 23-5A-1 provides: "No employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive benefits under this chapter." Alleged violations of this section are analyzed under the burden-shifting approach set forth in the *McDonnell Douglas* line of cases. *Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561, 581 (W. Va. 1996). The plaintiff has the initial burden of offering evidence to make out a prima facie case of discrimination. *Id.* The prima facie case requires a showing of three facts: "(1) an on-the-job injury was sustained; (2) proceedings were instituted under the Workers' Compensation Act, W. VA. CODE 23-1-1 *et seq.*; and (3) the filing of a workers' compensation claim was a significant factor in the employer's decision to discharge or otherwise discriminate against the employee." *Fravel v. Sole's Elec. Co.*, 624 S.E.2d 524, 525 (W. Va. 2005). If the plaintiff establishes his prima facie case, "the burden of production then shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions." *Skaggs*, 479 S.E.2d at 582. If the employer carries this burden, "the onus is once again on the employer to prove that

-12-

the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action." *Id*.

Here, Plaintiff alleges that "he was 'set up' and ambushed the day he was scheduled to return to 'light duty' work at [the mill], all in an attempt to discontinue his benefits." *Plaintiff's Memorandum in Support of Opposition*, at 9. According to Plaintiff, "Mr. Gue choreographed [his] return to work by convincing Dr. Craig that the company intended to allow plaintiff to answer phones." *Id*. However, he claims that his "return" was a mere ruse, and that Defendant "never had any intent to allow [him] to return to work in any capacity." *Id*. Rather, "the 'plan' was to immediately suspend plaintiff's employment, and his workers' compensation benefits, before he worked a single minute." *Id*. In Plaintiff's view, "[t]he plan went according to plan." *Id*. at 10.

Notwithstanding Plaintiff's theorizing, his claim fails at the most basic level because he has not offered any evidence of the third element of the prima facie case, that "the filing of a workers' compensation claim was a significant factor in the [Defendant's] decision to discharge or otherwise discriminate against [him]." *Fravel*, 624 S.E.2d at 525. The West Virginia Supreme Court has explained:

> What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of the protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion. This evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, or statistics in a large operation which show that members of the protected class received substantially worse treatment than others.

-13-

*Conaway v. E. Associated Coal Corp.*, 358 S.E.2d 423, 430 (W. Va. 1986). The evidence need not be direct and, in fact, usually is not. *Napier v. Stratton*, 513 S.E.2d 463, 465 (W. Va. 1998). Indirect evidence may include "proximity in time of the claim and the firing," "[e]vidence of satisfactory work performance and supervisory evaluations before the accident," and "any evidence of an actual pattern of harassing conduct for submitting the claim." *Id.*

While the six forms of evidence discussed above are not necessarily the only means by which Plaintiff could demonstrate that the filing of his workers' compensation claim was a significant factor in his termination, his failure to come forth with any of these types of evidence speaks volumes about the merits of his claim. Plaintiff has offered no statement of any Defendant official admitting to discrimination against him. He can point to no "case of unequal or disparate treatment between members of the protected class and others." *Conaway*, 358 S.E.2d at 430. To the contrary, the evidence suggests that Plaintiff was treated no differently than other employees. Two of Plaintiff's co-workers also were accused by the same man, at the same time, of selling pain pills to him. Neither of the two accused co-workers had previously suffered injuries for which they filed workers' compensation claims, but both were terminated, like Plaintiff. Moreover, Plaintiff had previously filed another workers' compensation claim for a prior injury, but was not discharged at that time. Regarding the third form of evidence noted, Plaintiff has introduced no statistics showing that those that file workers' compensation claims are treated substantially worse than others.

---

[5]Plaintiff argues that Mr. Gue told him "before and after his injury that [Defendant] does not favor workers' compensation lost time injuries because they cost the company money." *Plaintiff's Memorandum in Support of Opposition*, at 10. Plaintiff offers no citation in support of this claim, although in his response he earlier cited to pages 79 and 217 of his November 3, 2008 Deposition for a similar proposition. Unfortunately for Plaintiff, this portion of the deposition has not been entered into the record. Accordingly, the Court does not consider this supposed evidence, flimsy as it appears to be.

-14-

Plaintiff also lacks indirect evidence. The time between Plaintiff's second injury and his termination remains somewhat unclear. Plaintiff claims that he "was terminated within three months of filing his workers' compensation claim," although he never gives the date of the actual filing. *Plaintiff's Memorandum in Support of Opposition*, at 9. The Court presumes that Plaintiff filed his claim on the date of his injury, but Plaintiff has not offered evidence of when this date was, even approximately. In Plaintiff's response, he claims that the second injury occurred on December 16, 2006, although the cited pages of his deposition only indicate that the injury occurred when "all the other stuff that happened with the arbitration and all that." *October 17, 2008 Deposition of James Harbolt*, at 117. In fact, Plaintiff specifically says that, regarding the date of the injury, "I'm not sure." *Id.* At any rate, even giving Plaintiff the benefit of the doubt, the temporal proximity between the filing of the workers' compensation claim and Plaintiff's termination does not "sufficiently link [Defendant's] decision and the plaintiff's status as a member of the protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion." *Id.* While the Court does not find that a three-month period is necessarily too long to constitute evidence of a discriminatory link, under the facts of this case, where Plaintiff has not offered more, it also cannot serve as the evidentiary basis for Plaintiff's claim.

Similarly, Plaintiff has not introduced "[e]vidence of satisfactory work performance and supervisory evaluations before the accident" or "of an actual pattern of harassing conduct for submitting the claim," *Napier*, 513 S.E.2d at 465, at least not enough to provide a "sufficient link" between his workers' compensation claim and his termination. *Conaway*, 358 S.E.2d at 430. Plaintiff contends that "[t]here is no evidence that [Defendant] was unhappy with plaintiff's job performance prior to this injury, and in fact, [he] has testified to the contrary." *Plaintiff's*

-15-

*Memorandum in Support of Opposition*, at 10. Plaintiff fails to point to where in the record he testified to this effect, although this failure is likely of little import. Defendant fired Plaintiff for allegedly selling drugs in the workplace, not poor performance, so any evidence of Plaintiff's prior good work record is of extremely limited value indeed. Regarding "an actual pattern of harassing conduct for submitting the claim," there is simply no evidence. *Napier*, 513 S.E.2d at 465. While Plaintiff surely feels that Defendant's investigation, suspension and ultimate termination of him was "harassing," this collection of events was not a "pattern." *Id.* Rather, they were all part of a single incident, set in motion by the allegations of drug selling made against Plaintiff, and fueled by his possession of drugs in excess of his prescription while on company property.

There being no evidence that "the filing of a workers' compensation claim was a significant factor in the [Defendant's] decision to discharge or otherwise discriminate against [Plaintiff]," he has failed to establish his prima facie case. *Fravel*, 624 S.E.2d at 525. In light of this shortcoming, summary judgment is warranted.

### 2. West Virginia Code § 23-5A-3(a)

Plaintiff also alleges a violation of West Virginia Code § 23-5A-3(a). This subsection provides:

> It shall be a discriminatory practice within the meaning of section one of this article to terminate an injured employee while the injured employee is off work due to a compensable injury within the meaning of article four of this chapter and is receiving or is eligible to receive temporary total disability benefits . . . .

W. VA. CODE § 23-5A-3(a). Here, the last day for which Plaintiff received temporary total disability benefits was March 1, 2007. March 1, 2007 was the last day for which Plaintiff was "off work due

to a compensable injury." *Id.* On March 2, 2007, he returned to work, was investigated for allegedly selling drugs on company property, and terminated. Therefore, § 23-5A-3(a) does not apply, and summary judgment should be granted.

## C. Invasion of Privacy

Plaintiff alleges Defendant unreasonably intruded upon his seclusion. *See Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 85 (W. Va. 1983). Unreasonable intrusion upon another's seclusion occurs when "[o]ne . . . intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." RESTATEMENT (SECOND) OF TORTS § 652B. According to Plaintiff, Defendant unreasonably intruded upon his seclusion when its officials directed Plaintiff to empty his pockets, "paraded [him] through the plant, and into the locker room, where a shift change was in progress, such that pretty much everyone on his shift, as well as those coming on for the next shift, could witness his humiliation." *Plaintiff's Memorandum in Support of Opposition*, at 11. In Plaintiff's view, the intrusion continued to include the search of his car.

Other than *Crump*, which Plaintiff cites for the proposition that unreasonable intrusion upon another's seclusion is actionable in West Virginia, Plaintiff cites no cases. In particular, he directs the Court to no authority suggesting that a search conducted in a similar fashion or under similar circumstances constitutes unreasonable intrusion. On the other hand, Defendant cites several pieces

-17-

of authority, all of which appear to indicate that more is required for unreasonable intrusion than is present in this case.[6]

The Court has little trouble distinguishing this case from the cited examples of unreasonable intrusion. In this case, one of Plaintiff's co-workers reported to Defendant management that he had purchased pain pills from Plaintiff while on company property. The co-worker supported these allegations with a signed written statement and, later, a sworn, notarized affidavit. His allegations were specific in regards to the price paid for the pills and reasonably specific in regards to the number of pills purchased. The allegations were made against Plaintiff while he was off work due to his injury, presumably making it impossible or exceedingly difficult to investigate Plaintiff's conduct at that time. However, immediately upon Plaintiff's return to work, Defendant engaged in the investigation which serves as the basis of Plaintiff's claim.

---

[6]In relevant part, RESTATEMENT (SECOND) OF TORTS § 652B cmt. b provides:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may also be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

Defendant also cites two cases. *See Sutherland v. Kroger, Co.*, 110 S.E.2d 716 (W. Va. 1959) (finding unreasonable intrusion when a supermarket searched a customer's shopping bag brought from another store, without her consent, on three separate occasions); *Roach v. Harper*, 105 S.E.2d 564 (W. Va. 1958) (finding unreasonable intrusion when a landlord secretly listened to tenants' conversations through the use of a hidden mechanical device).

When Plaintiff reported to the Finish Department office as instructed on March 2, 2007, he was met by Mr. McMellon and Mr. Artrip, Defendant officials, as well as Mr. Preece, a representative from the union. Plaintiff states that "a couple other people [were] in the office," too, but "they left" when he arrived. *November 3, 2008 Deposition of James Harbolt*, at 25. Mr. McMellon told Plaintiff that "he wanted [him] to empty [his] pockets." *Id.* at 30. Mr. Preece then asked Mr. McMellon why Plaintiff should do so, to which Mr. McMellon replied "that there [were] allegations . . . that [Plaintiff] was selling prescription medication in the plant." *Id.* at 31. Asked at his deposition whether he consented to the search of his pockets, Plaintiff responded "[a]t first, no, I did not consent to it." *Id.* at 32. However, he further explained that "after talking to the union rep [Mr. Preece], [he] did go ahead and empty [his] pockets." *Id.* Apparently, Mr. Preece had advised Plaintiff, "[I]f you have nothing to hide, you know, just go along with them and all this." *Id.* Plaintiff acknowledged that he was "[n]ot physically" forced to empty his pockets, that he was "the one that emptied [his] pockets[,]" and that "[t]hey didn't reach into [his] pockets." *Id.* He agreed that he never told Mr. McMellon or Mr. Artrip that he refused to empty his pockets. He also agreed that he emptied his pockets, at least in part, because he "wanted to show them that [he] had nothing to hide." *Id.* Notwithstanding this apparent compliance, Plaintiff argues that he did not consent to the search, because he feels he "really had no choice." *Id.*

Next, Mr. McMellon and Mr. Artrip informed Plaintiff that "they wanted to go to [his] locker over in the shower room." *Id.* at 33. At his deposition, Plaintiff acknowledged that he "consent[ed]

-19-

to the search of [his] locker," stating, "I was fine with that."[7] *Id*. at 35. Like the search of Plaintiff's pockets, the search of his locker revealed no drugs.

Mr. McMellon and Mr. Artrip then told Plaintiff that "they wanted to go to [his] vehicle." *Id*. Plaintiff's vehicle was parked in the parking lot of a credit union, across the street from the mill. As the group walked to the lot, Mr. Preece objected: "Well, you guys can't go through his car. It's over on the parking lot, over on the Credit Union parking lot." *Id*. at 37. However, Mr. McMellon informed Plaintiff and Mr. Preece that Defendant actually owned the lot. Once at Plaintiff's vehicle, Mr. McMellon and Mr. Artrip "asked [Plaintiff] . . . to get in [his] vehicle." *Id*. Plaintiff replied, "No. . . . I don't want you all in my vehicle," but Mr. McMellon insisted: "Yeah, we are going to get in your vehicle, . . . because it is on our property." *Id*. At that point, Plaintiff stated, "If you're looking for my prescriptions that the company doctor gave me yesterday, they're in my arm console thing. . . . Here, I don't want you in my vehicle and tearing it up. I'll get it." *Id*. at 37-38. Plaintiff then reached into his vehicle, got his drugs, and handed them to Mr. McMellon and Mr. Artrip. While Plaintiff was retrieving the drugs, Mr. McMellon apparently searched Plaintiff's trunk, and he may have opened Plaintiff's back door. However, the only drugs recovered were those Plaintiff got from his console.

These facts present a far different situation than the various circumstances, discussed above, under which unreasonable intrusion upon another's seclusion has been found. One key difference

---

[7]In his response, Plaintiff claims that, in the locker room, "a shift change was in progress, such that pretty much everyone on his shift, as well as those coming on for the next shift, could witness his humiliation." *Plaintiff's Memorandum in Support of Opposition*, at 11. Plaintiff provides no citation to the record in support of this assertion, on page eleven or elsewhere in his response. For this reason, the Court ignores Plaintiff's unsupported claim that the search of his locker occurred during a shift change.

-20-

is that, in relation to the search of Plaintiff's pockets and locker at least, Plaintiff gave his consent. Although Plaintiff maintains in his brief that he did not consent to the search of his pockets, the record does not support that claim. In his deposition, Plaintiff only states that he did not consent "at first," but that he agreed to empty his pockets after speaking with Mr. Preece, the union representative. *Id.* at 32. He acknowledges that he was "[n]ot physically" forced to empty his pockets, he did not refuse, and, in fact, he "wanted to show [Mr. McMellon and Mr. Artrip] that [he] had nothing to hide." *Id.* While Plaintiff maintains he did not give his consent because he felt he "really had no choice," what Plaintiff really alleges here is that he faced a choice between two undesirable options. *Id.* Although Plaintiff may have been terminated, he could have refused to consent to the search, notwithstanding his assertions to the contrary.

To the extent that Mr. McMellon searched Plaintiff's vehicle, it appears that Plaintiff did not consent. However, Mr. McMellon's acts were wholly unlike, for example, a person entering the residence of another over that person's objections. *See* RESTATEMENT (SECOND) OF TORTS § 652B cmt. b. Plaintiff had been accused of selling drugs on company property. His car was parked on company property. The investigation was not into his "private affairs or concerns," but rather dealt with an issue closely linked to workplace safety. *Id.* § 652B. The search of Plaintiff's car under these circumstances, even without his consent, would not "be highly offensive to a reasonable person." *Id.* For these reasons, summary judgment should be granted.

## D. Defamation

In West Virginia, "[t]he essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3)

-21-

falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. pt. 1, *Crump*, 320 S.E.2d 70. Plaintiff initially based his claim for defamation on the statements of Mr. Groff made in his termination letter and during the grievance and arbitration proceedings. *See November 3, 2008 Deposition of James Harbolt*, at 114-117. However, Plaintiff has since abandoned that basis for his claim, and now alleges that Mr. McMellon defamed him when, "prior to [his] suspension and termination," Mr. McMellon stated in the presence of Mr. Artrip and Mr. Preece "that plaintiff sold drugs to [a co-worker]." *Plaintiff's Memorandum in Support of Opposition*, at 11. However, Plaintiff's newfound reliance on Mr. McMellon's statement is misplaced for at least two reasons.

First, the statement was not false. In his response, Plaintiff claims Mr. McMellon stated that "plaintiff sold drugs" to a co-worker. *Id.* However, the record does not bear out Plaintiff's assertion. In his deposition, Plaintiff testified that, when he entered the mill office and found Mr. McMellon, Mr. Artrip, and Mr. Preece there, Mr. Preece asked "what was going on," to which Mr. McMellon replied, "that there [were] *allegations* . . . that [Plaintiff] was selling prescription medication in the plant." *See November 3, 2008 Deposition of James Harbolt*, at 31 (emphasis added). Defendant has submitted both a signed, written statement and a sworn, notarized affidavit from Plaintiff's accuser, alleging that Plaintiff previously sold him pain pills. Plaintiff has never contested that there were not *allegations* that he had sold drugs on company property. Therefore, Mr. McMellon's statement was true.

Second, Mr. McMellon's statement was not "a nonprivileged communication to a third party." Syl. pt. 1, *Crump*, 320 S.E.2d 70. "A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication

-22-

of the statement to those persons who have a legitimate interest in the subject matter." *Id.* at 78. (quoting *Mauck v. Martinsburg*, 280 S.E.2d 216, 221 (W. Va. 1981)). Such privileges "usually extend[] to employer-employee relations." *Mauck*, 280 S.E.2d at 221. In determining whether the privilege applies, courts "focus[] on whether the communication dealt with facts 'which affect a sufficiently important interest of the publisher' and whether 'the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.'" *Id.* (quoting *Parker v. Appalachian Elec. Power Co.*, 30 S.E.2d 1, 4 (W. Va. 1944)).

In this case, Mr. McMellon's statement dealt with the reason for the investigation of Plaintiff, which surely was of "sufficiently important interest" to both Plaintiff and Defendant. *Id.* Moreover, although not entirely clear from the record and the briefings, it appears that Mr. Preece's presence was obtained so that Plaintiff would have the benefit of his counsel during the investigation or, at a minimum, a witness present who was not a company official. In any event, Mr. McMellon's statement to Mr. Preece regarding the basis for his request that Plaintiff empty his pockets appears to have been "of service in the lawful protection" of Defendant's interest, as well as in the interest of Plaintiff, in that it provided his union representative and him an explanation for the investigation. *Id.* Along these lines, the statement was made only "to those persons who ha[d] a legitimate interest in the subject matter[:]" Plaintiff, another Defendant official participating in the investigation (Mr. Artrip), and Plaintiff's union representative (Mr. Preece). Syl. pt. 1, *Crump*, 320 S.E.2d 70. Tellingly, aside from baldly asserting that the statement was "not privileged," Plaintiff makes no effort to explain *why* a qualified privilege does not apply under these circumstances. *See id.* at 78 (listing five requirements which must be met to overcome a qualified privilege). Accordingly, summary judgment is granted.

## IV. CONCLUSION

Pending before the Court are Defendant Steel of West Virginia, Inc.'s Motion for Summary Judgment (doc. 41) and Motion to Strike (doc. 72). For the foregoing reasons, the Court **GRANTS** these motions.

ENTER: June 15, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE