**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JAMES HARBOLT,

               Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:07-0661

STEEL OF WEST VIRGINIA, INC.,
a Delaware Corporation,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendant Steel of West Virginia, Inc.'s Motion for Summary Judgment (doc. 41) and Motion to Strike (doc. 72) .  For the following reasons, the Court **GRANTS** the Motion for Summary Judgment and **DENIES as moot** the Motion to Strike.

**I. FACTS**

Defendant hired Plaintiff to work as a laborer in 2002.  Plaintiff was also a member of the Local 37 Steelworkers union.  On October 27, 2005, Plaintiff was operating the saw on the universal mill, or U-mill, through which steel bars pass for final cleaning and straightening.  Plaintiff's job was to make sure that the "guides" on the U-mill were functioning properly.  A problem developed with the guides, and someone instructed Plaintiff to change them.  Plaintiff claims that, while performing this task, he slipped on a greasy floor and slid or landed three to four feet under the U-mill, but was able to catch himself prior to falling into a pit located beneath it.  Plaintiff states he injured his back and knee in the fall.  According to Plaintiff, there were "gobs of grease" on the floor, so much that "sometimes you can scoop it up with a shovel," because it "flies off" the bearings of the U-mill.

*October 17, 2008 Deposition of James Harbolt*, at 74.  He further alleges that grease sometimes "splatter[ed] . . . 15, 20 feet away from [the U-mill]" and that there was grease on the floor "24/7." *Id.* at 75.  During his deposition, Plaintiff stated that the floor next to the U-mill was "an ice rink." *Id.* at 74.

Defendant primarily used power washers to remove grease from the floor.[1]  These power washers were available throughout the steel mill, including the U-mill area, and were available for use by employees at any time.  Plaintiff contends, however, that use of the power washers "makes [the situation] ten times worse" because the grease "mixe[s] with [the] water" and forms "a greasy residue," causing people to slip every day.  *Id.* at 76, 80.  Plaintiff further alleges he informed several Defendant supervisors and officials and the union president about the perceived problem.  He states that, in particular, he complained to one of his supervisors, Larry Black, "a bunch of times."  *Id.* at 84.  Plaintiff further claims that Defendant officials responded, "We'll see what we can do," but ultimately did nothing regarding the grease and water problem other than place some type of posting about it on a company bulletin board.  *Id.* at 140.  Somewhat paradoxically, however, Plaintiff also complains that "[t]he floors were not power washed on a daily basis," but rather only "when the entire steel mill was shut down, or just the U-Mill was shut down."  *Plaintiff's Memorandum in Support of Opposition*, at 2 (internal citations omitted).

Plaintiff also testified that he believed that the lack of handrails on the U-mill made it unsafe and that they would have prevented him from falling underneath it.  He claims he told "probably all of [his supervisors,]" although he does not remember telling any of them in particular.  *October 17, 2008 Deposition of James Harbolt*, at 172.  Plaintiff alleges that, whichever supervisors he told about

---

[1]Towels were also available for employees to wipe grease from the floor.

the perceived need for handrails, they did not address it.  He further claims that the U-mill lacked necessary handholds, although he does not indicate that he brought this supposed problem to the attention of any management personnel.

Plaintiff returned from his first injury in March or April 2006, only to suffer a second round of injuries in December of that year, this time to his shoulder, neck, and chest.  Plaintiff again was unable to work.  Like his first set of injuries, these injuries were also covered by workers' compensation.  Plaintiff planned that he would return from his injuries in February 2007.  On February 27, 2007, Plaintiff visited his treating physician, Dr. Paul Craig.  Because Plaintiff had not yet had the MRI required for him to return to work, Dr. Craig was forced to continue to keep him out of work.

Defendant's Human Resources Manager, Larry Gue, contacted Dr. Craig and asked that Plaintiff be released to "light duty" work.  Dr. Craig agreed and prepared light duty restrictions for Plaintiff.  After receiving these restrictions, Mr. Gue contacted Dave McMellon, Superintendent of the Finish and Fabrication Department, and informed him of Plaintiff's restrictions.  The two agreed that Plaintiff was able to work in the office answering telephones.  Mr. Gue then contacted Plaintiff and informed him that he was to report to work at the beginning of his next regularly scheduled shift, on March 2, 2007, to answer phones in the mill office.

Sometime between Plaintiff's second injury and his return on March 2, 2007, another employee for Defendant reported to management that he had previously bought approximately fifteen to twenty pain pills for seven dollars apiece from Plaintiff.  This employee made similar allegations against two other employees.  After an investigation revealed the other two accused employees possessed prescription narcotics in an amount sufficient to engage in the alleged sales, both were

terminated.  As for Plaintiff, Mr. Gue and Mr. McMellon conferred and decided that Plaintiff should be investigated upon his return to work.

Plaintiff reported to the mill office on March 2 as directed.  Three others were there: Mr. McMellon; Paul Preece, a union representative; and Christopher Artrip, Manager of Defendant's Environmental Health and Safety Program.  Mr. McMellon directed Plaintiff to empty his pockets. Mr. Preece asked why Plaintiff needed to empty his pockets,[2] and Mr. McMellon informed Mr. Preece and Plaintiff of the allegations made against Plaintiff.  Plaintiff asked Mr. Preece if he should comply, and Mr. Preece advised Plaintiff to comply if he had nothing to hide.  Plaintiff then emptied his pockets, which proved to contain no drugs.  The parties dispute whether Plaintiff consented to this search.  At his deposition, Plaintiff conceded that he was not physically forced to empty his pockets and that he did so only after speaking with Mr. Preece.  However, he also maintained that he "really had no choice."  *November 3, 2008 Deposition of James Harbolt*, at 32.

Mr. McMellon then told Plaintiff he wished to search his locker, to which Plaintiff consented.  On the way to the locker, Mr. McMellon informed Plaintiff that he was suspended.  The locker also proved to contain no drugs.  Plaintiff contends that this portion of the investigation occurred during a shift change, and was therefore witnessed by "everybody."  *Id*. at 132.

Next, Mr. McMellon advised Plaintiff that he wished to search his vehicle.  Plaintiff and Mr. Preece objected on the ground that his vehicle was parked across the street on a credit union's parking lot, which the pair believed was not company property.  Mr. McMellon informed them that

---

[2]In his memorandum, Plaintiff claims that he "asked what was going on," but it appears from the record that it was Mr. Preece that asked why Plaintiff needed to empty his pockets.  *Plaintiff's Memorandum in Support of Opposition*, at 4; *see November 3, 2008 Deposition of James Harbolt*, at 31.

Defendant in fact owned the lot.  When they arrived at the vehicle, Plaintiff stated: "Here, I don't want you in my vehicle tearing it up.  I'll get [the prescription drugs]."  *Id.* at 38.  Plaintiff explained at his deposition that at that point he "reached in [the vehicle] and got the prescription."  *Id.* According to Plaintiff, as he was retrieving the drugs from his vehicle, Mr. McMellon opened the trunk, and perhaps a back door, and began searching on his own.  Mr. McMellon then directed everyone to accompany him to Mr. Gue's office.  Mr. McMellon informed Mr. Gue that Plaintiff had possessed, in his vehicle, two types of prescription narcotic drugs in quantities in excess of what Plaintiff had been prescribed to take on a daily basis.  Mr. Gue then reiterated Mr. McMellon's earlier statement that Plaintiff was suspended.  Initially, Mr. Gue told Plaintiff that all of his benefits were "ceased or cut or no more."  *Id.* at 46.  After speaking with Mr. Preece, however, Mr. Gue stated that he would "have to check on his medical or whatever."  *Id.*  He also kept one of each of his pills, with Plaintiff's permission, although Plaintiff claims he did not later return them as agreed.

At his deposition, Plaintiff testified that he was aware of no rule or provision of the collective bargaining agreement that prohibited an employee from possessing, on company grounds, more prescription medication than he could consume during his shift.  He also stated that Defendant was aware that he had medications of these types because they had been prescribed by the company doctor.

In a letter dated April 23, 2007, Defendant terminated Plaintiff's employment.  The letter gave three reasons for Plaintiff's termination.  First, it claimed Plaintiff had sold drugs to a co-worker while at work.  Second, it pointed out that Plaintiff had possessed, on company property, pain pills in excess of what he could consume during his shift, based on his prescription.  Third, the letter observed that Plaintiff had purchased two sets of different pain pills within three days of each

other in May 2006, which the letter described as "doubl[ing] up." *Declaration of Larry Gue*, Ex. 2. This letter was written by Bruce Groff, Defendant's Vice President of Administration. According to Plaintiff, Mr. Groff accused him of being a "drug dealer" and a "drug user" during his suspension and subsequent termination, through his reinstatement after the arbitration proceeding. *November 3, 2008 Deposition of James Harbolt*, at 114. Specifically, Plaintiff states that Mr. Groff made these statements during the investigation and in the termination letter. The statements were allegedly made to Plaintiff, "the union," and "the guys that [were] there [at the union hearing], . . . like McMellon and a bunch of them." *Id.* at 116. Around the time of Plaintiff's suspension, Defendant also put up a posting "that generally requested information regarding illegal drug trafficking." *Plaintiff's Memorandum in Support of Opposition*, at 6. Despite the general nature of the posting, Plaintiff stated that he felt that it "was directed to him," apparently because "other employees . . . question[ed] [him] regarding the company's allegations against him." *Id.*

Plaintiff and the other two men who had been terminated for the same alleged conduct all grieved their terminations, which Defendant denied. The union then took the terminations to arbitration, and prevailed on all of them. Each of the terminated men was reinstated with full back pay, interest, and benefits. Plaintiff returned to work in February 2008, albeit in a different department into which he had bid. In this new department, Plaintiff has been disciplined, or stepped, three or four times. Plaintiff claims that these steps were in retaliation for filing his second workers' compensation claim because Mr. Gue has told him that "when you're out of work, when you're off the job due to injury, it costs them money." *November 3, 2008 Deposition of James Harbolt*, at 79. According to Plaintiff, it is standard practice for Defendant supervisors to discipline employees who file workers' compensation claims or get hurt. Plaintiff further maintains that he had never been

threatened with termination prior to filing his second workers' compensation claim, but that he has since received such threats.

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

# III. DISCUSSION

## A. Deliberate Intent

West Virginia Code § 23-4-2 governs "[d]isbursement where injury is . . . intentionally caused by [an] employer." A showing of deliberate intent in this case requires Plaintiff to introduce evidence in support of five facts:

> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>
> (B) That the employer, prior to injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;
>
> (C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions.
>
> (D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and
>
> (E) That the employee exposed suffered serious compensable injury or compensable death as defined in [§ 23-4-1] whether a claim for benefits under this chapter is filed or not as a direct and proximate result of the specific unsafe working condition.

W. VA. CODE § 23-4-2(d)(2)(ii).  Because the Court finds that Plaintiff has offered no evidence in support of the second element, the Court does not consider the existence of the first, third, fourth and fifth elements.

The second element requires prior actual knowledge of both "the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition." *Id*. § 23-4-2(d)(2)(ii)(B).  Actual knowledge "is a high threshold that cannot be successfully met by speculation or conjecture." *Mumaw v. U.S. Silica Co.*, 511 S.E.2d 117, 123 (W. Va. 1998).  "This requirement is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition. Instead, it must be shown that the employer actually possessed such knowledge." *Id.*  Moreover, knowledge of the specific unsafe working condition alone is insufficient; rather, Defendant must "also [have] realized the 'high degree of risk and strong probability of serious injury or death presented by [the] specific unsafe working condition.'" *Ryan v. Clonch Indus.*, 639 S.E.2d 756, 765 (W. Va. 2006) (quoting § 23-4-2(d)(2)(ii)(B)).

Although there must be evidence, "especially[,] . . . that the employer had a subjective realization" of the magnitude of the danger presented, *Mumaw*, 511 S.E.2d at 123, the necessary inquiry also "requires an interpretation of the employer's state of mind, and must ordinarily be shown by circumstantial evidence, from which conflicting inferences may often reasonably be drawn."  Syl. pt. 2, *Nutter v. Owens-Illinois, Inc.,* 550 S.E.2d 398 (W. Va. 2001).  "[T]he type of evidence presented to establish the requisite subjective knowledge on the part of the employer often has been presented as evidence of prior similar injuries or of prior complaints to the employer

regarding the unsafe working condition . . . ." *Ryan*, 639 S.E.2d at 765.  However, "evidence of prior similar incidents or complaints is not mandated by [the statute]."  Syl. pt. 2, *Nutter*, 550 S.E.2d 398.

In relation to this element, Plaintiff argues that he complained to various management officials for Defendant about the grease and lack of railings around the U-mill prior to his injury and that his expert witness, "Dr. Winn[,] has explained in his report and in his deposition testimony how and why this is an extremely dangerous condition, and how and why [Defendant] was aware of it prior to plaintiff's injury." *Plaintiff's Supplemental Memorandum in Opposition*, at 6.  Taking the facts in the light most favorable to Plaintiff, the Court accepts the proposition that Plaintiff complained to Defendant about the perceived problem of the floor conditions and the lack of railings.  However, at most this fact only shows that Defendant was aware of the existence of these conditions, not that Defendant had the requisite "actual knowledge" that they presented a "high degree of risk and the strong probability of serious injury or death."[3]  W. VA. CODE § 23-4-2(d)(2)(ii)(B).

Plaintiff argues, vaguely, that Dr. Winn explained in his deposition testimony and report "how and why" Defendant was aware of the *danger* presented by these conditions.  *Plaintiff's Supplemental Memorandum in Opposition*, at 6.  In fact, the deposition transcript and the report reveal no such explanation.[4]  At his deposition, Dr. Winn testified that he used the terms "actual

---

[3]Strictly for the sake of argument, the Court accepts Plaintiff's contention that the floor and lack of handrails presented "specific unsafe working condition[s]," as required by W. VA. CODE § 23-4-2(d)(2)(ii)(A).

[4]The Court notes that Plaintiff provides no citation to these documents, but rather leaves it for the Court to scour them, including Dr. Winn's 156-page deposition transcript, for the alleged
(continued...)

-10-

knowledge" and "subjective realization" in his affidavit and report because "the deliberate intent case has to hinge on certain tests, and they all have to be there or the test fails." *Deposition Gary L. Winn, Ph.D.*, at p. 101. In other words, it appears that Dr. Winn opined that Defendant had actual knowledge or a subjective realization of the danger presented by the greasy floor and lack of railings because he understood that Plaintiff is required by law to make this showing. However, legal necessity is hardly an adequate basis on which to base such conclusions.

The alternative bases provided by Dr. Winn at his deposition are no better. When asked if he believed Defendant had actual knowledge of the risk presented by the absence of handrails because they were, in fact, absent, Dr. Winn replied that this fact only constituted part of his reasoning. He added that he also concluded that Defendant had actual knowledge because it submitted several affidavits in which various employees, both management and union, testified that "the accumulation of grease on the floor is inevitable . . . , pretty much in the same words curiously." *Id.* at p. 98. First, Dr. Winn's reasoning that the mere absence of guardrails means that Defendant had actual knowledge that the area surrounding the U-mill presented "a high degree of risk and the strong probability of serious injury or death" cannot sustain the proffered conclusion. W. Va. Code § 23-4-2(d)(2)(ii)(B). Actual knowledge "is not satisfied merely by evidence that the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition," nor is it "met by speculation or conjecture." *Mumaw*, 511 S.E.2d at 123. "Instead, it must be shown that the employer actually possessed such

---

[4](...continued)
explanation. In the future, counsel would be well-advised to provide the necessary evidentiary support for his arguments, instead of relying on the Court to do so for him.

knowledge." *Id.* Here, the uncontradicted evidence on this point is that Defendant did not view either the floor or the lack of railings as posing a high risk and strong probability of serious injury.[5]

Second, Dr. Winn's assertion that Defendant had actual knowledge of the danger presented by the floor and the lack of handrails because of the similarity in the declarations submitted by Defendant is unacceptable. Dr. Winn is an industrial safety expert. He has offered no explanation as to how his education, experience or training provides him specialized insight into the credibility of these declarants. In essence, Plaintiff, through Dr. Winn's deposition testimony, asks this Court to conclude that Defendant had actual knowledge because Defendant's witnesses uniformly state that it did not have actual knowledge. Although creative, this argument is utterly devoid of logic.

---

[5]*See Declaration of Larry Black*, at ¶ 3, 7 ("[Defendant] takes reasonable and appropriate efforts to remove the grease from the floor to keep the working environment safe. . . . I do not recall James Harbolt repeatedly complaining to me about . . . a perceived need for handrails around the U-Mill . . . . or [the issue] being raised at safety committee meetings. I also do not recall any grievances being filed over these issues."); *Declaration of Christopher Artrip*, at ¶ 6-7 ("I do not recall James Harbolt repeatedly complaining to me about . . . a perceived need for handrails around the U-Mill . . . . or [the issue] being raised at safety committee meetings. I also do not recall any grievances being filed over [the] issue[]. It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors."); *Declaration of Jared Gilliam*, at ¶ 6 ("It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors. I regularly run through the mill."); *Declaration of Carl Runyan*, at ¶ 4, 7 ("I do not personally recall Mr. Harbolt, or others, repeatedly complaining to me about . . . a need for handrails around the U-Mill. Additionally, I do not recall the issue . . . being raised by the Union. I also did not file and do not recall any grievances being filed over [the] issue[]. . . . It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors. . . . I do not believe that there is a lot of grease on the floors of the #1 Mill and around the U-Mill and do not believe that this is a safety issue or was a safety issue when [Plaintiff] was injured."); *Declaration of Clyde Bess*, at ¶ 6 ("I never complained about . . . a need for handrails around the U-Mill. Additionally, I do not recall others complaining about the issue. I also did not file and do not recall any grievances being filed over [the] issue[]. . . . It is inaccurate to describe the floor in the #1 Mill and around the U-Mill as an ice skating rink. Employees can walk normally on the floors. . . . I do not believe that there is a lot of grease on the floors of the #1 Mill and around the U-Mill and do not believe that this is a safety issue or was a safety issue when [Plaintiff] was injured.").

Nothing in Dr. Winn's deposition testimony could permit a jury to conclude that Defendant had actual knowledge that the greasy floor and lack of handrails presented the type of risk described in W. VA. CODE § 23-4-2(d)(2)(ii)(B).

Dr. Winn's report is similarly problematic.  Again, Dr. Winn bases his opinion regarding actual knowledge "upon the fact that there were no guardrails, handholds or covers around the U-mill prior to Mr. Harbolt's injury" and the fact "that none of these safety features exist to this day." *Dr. Winn's Report*, at p. 10.  As discussed above, this amounts to an argument that Defendant "reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition."  *Mumaw*, 511 S.E.2d at 123. Such "speculation [and] conjecture" is insufficient to demonstrate actual knowledge. *Id.*  The only other argument regarding actual knowledge made by Dr. Winn in his report is that Defendant "was also obviously aware of its hazard training and inspections obligations under the aforementioned OSHA guidelines, although it chose not to to [sic] so with its workforce prior to or subsequent to Mr. Harbolt's injury."  *Dr. Winn's Report*, at p. 10.  At Dr. Winn's deposition, defense counsel asked how Dr. Winn knew what Defendant chose to do or chose not to do, to which he replied: "That's a good question. . . . I could take that out and everything else stands.  I'm not happy with that either, because I don't have any empirical means of telling.  Good catch."  *Deposition Gary L. Winn, Ph.D.*, at p. 97-98.  In light of this concession, and for the foregoing reasons, it is apparent to the Court that Plaintiff lacks any evidence that Defendant "had actual knowledge . . . of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition."  W. VA. CODE § 23-4-2(d)(2)(ii)(B).

-13-

Although Plaintiff cites no case law in support of his deliberate intent claim, the Court notes that this case is easily distinguishable from those cases in which employers have been charged with actual knowledge.  In *Mayles v. Shoney's, Inc.*, the West Virginia Supreme Court of Appeals found sufficient evidence of actual knowledge of the risk and probability of serious injury or death resulting from a dangerous condition or practice.  405 S.E.2d 15, 24 (W. Va. 1990).  In that case, as in this one, there had been prior complaints about the dangerous practice.[6]  *Id.* at 17.  However, the similarities end there, in that *Mayles* involved much more evidence of actual knowledge.  In *Mayles*, a new employee experienced severe burns and disfiguring scarring after he slipped and fell on a wet grassy slope while carrying a five-gallon lidless bucket of hot grease to a disposal location outside the restaurant.  *Id.* at 16, 17, 21.  The grassy slope had a "drop" of seven to eight feet over a distance of thirty-two to thirty-four feet.  *Id.* at 21.  The plaintiff testified that he received no training regarding disposal of the grease, other than that the unit manager had told him "to watch other employees and follow their lead."  *Id.* at 16.  In particular, he testified that "no one had instructed him to wait until the grease was cold before carrying it out; and that from his observations, the grease was always immediately disposed of while it was hot," although he also acknowledged that the only previous time he had disposed of grease it had been cold.  *Id.* at 16-17.

Two other employees of the defendant corroborated the plaintiff's testimony that the practice at the restaurant was to dispose of the grease while it was hot.  *Id.* at 17.  This testimony was further corroborated by Terry Franks, a former unit manager at the restaurant.  *Id.*  At the trial, she explained: "[I]t was just the general feeling around the store that we were always so short on

---

[6]In fact, it appears that in *Mayles* the evidence indicated that multiple people had complained about the practice.  405 S.E.2d at 17.

laborers and trying to cut hours that everything was done right now, get it done, get the people off the clock and then that was the end of the day." *Id.* (internal quotations omitted).  Ms. Franks was also the person to which employees had complained about the practice, although she did not relay these complaints to the subsequent unit manager, Fred Hunt, who was in charge at the time of the plaintiff's accident.  *Id.*  Ms. Franks further testified that grease was carried over the grassy slope "because the bucket was too hot and heavy and the other routes too long." *Id.*  Finally, she disclosed that another employee had previously been injured in the same manner as the plaintiff.  *Id.*  Mr. Hunt testified that he was not aware that there had been a prior injury and that he required employees to allow the grease to cool before disposing of it, although he acknowledged "rumors that hot oil was being disposed of behind his back." *Id.* at 18.  Mr. Hunt did not address these "rumors" until after the plaintiff's injury.  *Id.*

In this case, there is no evidence that Defendant had actual knowledge of the danger presented by the greasy floor or the lack of handrails around the U-mill.  While Plaintiff claims that he repeatedly complained about these conditions, the fact remains that Defendant simply did not view these conditions as presenting a "high degree of risk and the strong probability of serious injury or death . . . ."  W. VA. CODE § 23-4-2(d)(2)(ii)(B).  As noted above, Defendant has submitted the declarations of several employees stating that they did not consider the floor or lack of handrails a safety hazard, let alone one that meets the requirements of W. VA. CODE § 23-4-2(d)(2)(ii)(B).  *See, infra,* note 5.  These declarations were not only from Defendant management, but also from union employees, including a former union president.  *See Declaration of Carl Runyon; Declaration of Clyde Bess.*  Notably, Plaintiff has submitted no declarations from other employees corroborating his view of the conditions at the mill.  While the Court is obligated to accept as true Plaintiff's claim

-15-

that he complained to Defendant management about the dangers he perceived, this fact does not mean that Defendant was obligated to agree with him.  Although "a plaintiff may choose to introduce evidence of prior . . . complaints to circumstantially establish that an employer has acted with deliberate intention, evidence of prior . . . complaints is not mandated by [the statute]."  Syl. pt. 2, *Nutter,* 550 S.E.2d 398.  The Court believes that the converse of this statement is also true: in some circumstances, an employer may lack the subjective realization of the risk presented by a dangerous condition, notwithstanding complaints about that condition.  *Cf. Blevins v. Beckley Magnetite, Inc.*, 408 S.E.2d 385, 387-388, 393 (W. Va. 1991) (finding that the employer lacked actual knowledge of the danger of moving machinery, notwithstanding a prior citation for not erecting a guard next to it, in part because the employer had subsequently erected a fence next to it).

Other factors also indicate that Defendant possessed no actual knowledge of the dangers presented by these conditions.  First, there is no evidence that anyone had ever previously been injured in a similar accident.  While prior injuries are clearly not required, they are commonly used to demonstrate actual knowledge.  *See* Syl. pt. 2, *Nutter*, 550 S.E.2d 398; *see also, e.g., Sias v. W-P Coal Co.*, 408 S.E.2d 321, 327 (W. Va. 1991) (finding that a prior similar accident was evidence of actual knowledge of the underlying dangerous condition).  Second, Defendant believed that it was adequately addressing the grease on the floor by making power washers and towels readily available for employee use throughout the plant.  *See, infra,* note 5.  Plaintiff complains that handrails were necessary due to the risk of falling on the greasy floors.  If Defendant believed that it was reasonably addressing grease on the floors, then it follows that Defendant also believed that there was no need for handrails around the U-mill, because there was no reason to expect anyone to fall in that area.  Third, there is an alternative reason why Defendant could have believed that handrails were

-16-

unnecessary.  Plaintiff claims that handrails were needed, at least in part, because of the "significant hazard of falling into the pit" located beneath the U-mill.  *Plaintiff's Memorandum in Support*, at p. 2.  However, it was revealed at oral argument that the U-mill effectively covers the pit beneath it, which, presumably, makes it impossible or exceedingly difficult to actually fall into the pit.

For all of these reasons, it is apparent that Defendant lacked actual knowledge that the greasy floor and lack of handrails constituted the type of conditions contemplated by W. VA. CODE § 23-4-2(d)(2)(ii).  No reasonable jury could find otherwise.  Defendant should be granted summary judgment as to Plaintiff's deliberate intention claim.

## B. Workers' Compensation Discrimination

### 1. West Virginia Code § 23-5A-1

West Virginia Code § 23-5A-1 provides: "No employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive benefits under this chapter."  Alleged violations of this section are analyzed under the burden-shifting approach set forth in the *McDonnell Douglas* line of cases.  *Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561, 581 (W. Va. 1996).  The plaintiff has the initial burden of offering evidence to make out a prima facie case of discrimination.  *Id.*  The prima facie case requires a showing of three facts: "(1) an on-the-job injury was sustained; (2) proceedings were instituted under the Workers' Compensation Act, W. VA. CODE 23-1-1 *et seq.*; and (3) the filing of a workers' compensation claim was a significant factor in the employer's decision to discharge or otherwise discriminate against the employee."  *Fravel v. Sole's Elec. Co.*, 624 S.E.2d 524, 525 (W. Va. 2005).  If the plaintiff establishes his prima facie case, "the burden of production then shifts to the employer

-17-

to come forward with a legitimate, nondiscriminatory reason for its actions." *Skaggs*, 479 S.E.2d at 582. If the employer carries this burden, "the onus is once again on the employer to prove that the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action." *Id*.

Here, Plaintiff alleges that "he was 'set up' and ambushed the day he was scheduled to return to 'light duty' work at [the mill], all in an attempt to discontinue his benefits." *Plaintiff's Memorandum in Support of Opposition*, at 9. According to Plaintiff, "Mr. Gue choreographed [his] return to work by convincing Dr. Craig that the company intended to allow plaintiff to answer phones." *Id*. However, he claims that his "return" was a mere ruse, and that Defendant "never had any intent to allow [him] to return to work in any capacity." *Id*. Rather, "the 'plan' was to immediately suspend plaintiff's employment, and his workers' compensation benefits, before he worked a single minute." *Id*. In Plaintiff's view, "[t]he plan went according to plan." *Id*. at 10.

Notwithstanding Plaintiff's theorizing, his claim fails at the most basic level because he has not offered any evidence of the third element of the prima facie case, that "the filing of a workers' compensation claim was a significant factor in the [Defendant's] decision to discharge or otherwise discriminate against [him]." *Fravel,* 624 S.E.2d at 525. The West Virginia Supreme Court has explained:

> What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of the protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion. This evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, or statistics in a large operation which show that members

-18-

> of the protected class received substantially worse treatment than
> others.

*Conaway v. E. Associated Coal Corp.*, 358 S.E.2d 423, 430 (W. Va. 1986).  The evidence need not be direct and, in fact, usually is not.  *Napier v. Stratton*, 513 S.E.2d 463, 465 (W. Va. 1998).  Indirect evidence may include "proximity in time of the claim and the firing," "[e]vidence of satisfactory work performance and supervisory evaluations before the accident," and "any evidence of an actual pattern of harassing conduct for submitting the claim." *Id.*

    While the six forms of evidence discussed above are not necessarily the only means by which Plaintiff could demonstrate that the filing of his workers' compensation claim was a significant factor in his termination, his failure to come forth with any of these types of evidence speaks volumes about the merits of his claim.  Plaintiff has offered no statement of any Defendant official admitting to discrimination against him.[7]  He can point to no "case of unequal or disparate treatment between members of the protected class and others." *Conaway*, 358 S.E.2d at 430.  To the contrary, the evidence suggests that Plaintiff was treated no differently than other employees.  Two of Plaintiff's co-workers also were accused by the same man, at the same time, of selling pain pills to him.  Neither of the two accused co-workers had previously suffered injuries for which they filed workers' compensation claims, but both were terminated, like Plaintiff.  Moreover, Plaintiff had previously filed another workers' compensation claim for a prior injury, but was not discharged at

---

    [7]Plaintiff argues that Mr. Gue told him "before and after his injury that [Defendant] does not favor workers' compensation lost time injuries because they cost the company money." *Plaintiff's Memorandum in Support of Opposition*, at 10. However, Mr. Gue's statement of an obvious fact hardly constitutes an admission of discrimination. Defendant readily acknowledges that it "believes it is better for the company and its employees to be working in some capacity than to be at home." *Declaration of Larry Gue*, at ¶ 3.  Even viewing Mr. Gue's statement in the light most favorable to Plaintiff, it cannot be interpreted as evidence that Defendant takes any untoward action toward those that file workers' compensation claims.

that time.  Regarding the third form of evidence noted, Plaintiff has introduced no statistics showing that those that file workers' compensation claims are treated substantially worse than others.

Plaintiff also lacks indirect evidence.  The time between Plaintiff's second injury and his termination remains somewhat unclear.  Plaintiff claims that he "was terminated within three months of filing his workers' compensation claim," although he never gives the date of the actual filing. *Plaintiff's Memorandum in Support of Opposition*, at 9.  The Court presumes that Plaintiff filed his claim on the date of his injury, but Plaintiff has not offered evidence of when this date was, even approximately.  In Plaintiff's response, he claims that the second injury occurred on December 16, 2006, although the cited pages of his deposition only indicate that the injury occurred when "all the other stuff that happened with the arbitration and all that." *October 17, 2008 Deposition of James Harbolt*, at 117.  In fact, Plaintiff specifically says that, regarding the date of the injury, "I'm not sure." *Id.*  At any rate, even giving Plaintiff the benefit of the doubt, the temporal proximity between the filing of the workers' compensation claim and Plaintiff's termination does not "sufficiently link [Defendant's] decision and the plaintiff's status as a member of the protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion." *Id.*  While the Court does not find that a three-month period is necessarily too long to constitute evidence of a discriminatory link, under the facts of this case, where Plaintiff has not offered more, it also cannot serve as the evidentiary basis for Plaintiff's claim.

Similarly, Plaintiff has not introduced "[e]vidence of satisfactory work performance and supervisory evaluations before the accident" or "of an actual pattern of harassing conduct for submitting the claim," *Napier*, 513 S.E.2d at 465, at least not enough to provide a "sufficient link" between his workers' compensation claim and his termination.  *Conaway*, 358 S.E.2d at 430.

-20-

Plaintiff contends that "[t]here is no evidence that [Defendant] was unhappy with plaintiff's job performance prior to this injury, and in fact, [he] has testified to the contrary." *Plaintiff's Memorandum in Support of Opposition*, at 10. Plaintiff fails to point to where in the record he testified to this effect, although this failure is likely of little import. Defendant fired Plaintiff for allegedly selling drugs in the workplace, not poor performance, so any evidence of Plaintiff's prior good work record is of extremely limited value indeed. Regarding "an actual pattern of harassing conduct for submitting the claim," there is simply no evidence. *Napier*, 513 S.E.2d at 465. While Plaintiff surely feels that Defendant's investigation, suspension and ultimate termination of him was "harassing," this collection of events was not a "pattern." *Id.* Rather, they were all part of a single incident, set in motion by the allegations of drug selling made against Plaintiff, and fueled by his possession of drugs in excess of his prescription while on company property.

There being no evidence that "the filing of a workers' compensation claim was a significant factor in the [Defendant's] decision to discharge or otherwise discriminate against [Plaintiff]," he has failed to establish his prima facie case. *Fravel,* 624 S.E.2d at 525. In light of this shortcoming, summary judgment is warranted.

### 2. West Virginia Code § 23-5A-3(a)

Plaintiff also alleges a violation of West Virginia Code § 23-5A-3(a). This subsection provides:

> It shall be a discriminatory practice within the meaning of section one of this article to terminate an injured employee while the injured employee is off work due to a compensable injury within the meaning of article four of this chapter and is receiving or is eligible to receive temporary total disability benefits . . . .

-21-

W. VA. CODE § 23-5A-3(a).  Here, the last day for which Plaintiff received temporary total disability benefits was March 1, 2007.  March 1, 2007 was the last day for which Plaintiff was "off work due to a compensable injury."  *Id*.  On March 2, 2007, he returned to work, was investigated for allegedly selling drugs on company property, and terminated.  Therefore, § 23-5A-3(a) does not apply, and summary judgment should be granted.

**C. Invasion of Privacy**

Plaintiff alleges Defendant unreasonably intruded upon his seclusion.  *See Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 85 (W. Va. 1983).  Unreasonable intrusion upon another's seclusion occurs when "[o]ne . . . intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person."  RESTATEMENT (SECOND) OF TORTS § 652B.  According to Plaintiff, Defendant unreasonably intruded upon his seclusion when its officials directed Plaintiff to empty his pockets, "paraded [him] through the plant, and into the locker room, where a shift change was in progress, such that pretty much everyone on his shift, as well as those coming on for the next shift, could witness his humiliation."  *Plaintiff's Memorandum in Support of Opposition*, at 11.  In Plaintiff's view, the intrusion continued to include the search of his car.

Other than *Crump*, which Plaintiff cites for the proposition that unreasonable intrusion upon another's seclusion is actionable in West Virginia, Plaintiff cites no cases.  In particular, he directs the Court to no authority suggesting that a search conducted in a similar fashion or under similar circumstances constitutes unreasonable intrusion.  On the other hand, Defendant cites several pieces

-22-

of authority, all of which appear to indicate that more is required for unreasonable intrusion than is present in this case.[8]

The Court has little trouble distinguishing this case from the cited examples of unreasonable intrusion.  In this case, one of Plaintiff's co-workers reported to Defendant management that he had purchased pain pills from Plaintiff while on company property.  The co-worker supported these allegations with a signed written statement and, later, a sworn, notarized affidavit.  His allegations were specific in regards to the price paid for the pills and reasonably specific in regards to the number of pills purchased.  The allegations were made against Plaintiff while he was off work due to his injury, presumably making it impossible or exceedingly difficult to investigate Plaintiff's conduct at that time.  However, immediately upon Plaintiff's return to work, Defendant engaged in the investigation which serves as the basis of Plaintiff's claim.

---

[8]In relevant part, RESTATEMENT (SECOND) OF TORTS § 652B cmt. b provides:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires.  It may also be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

Defendant also cites two cases.  *See Sutherland v. Kroger, Co.*, 110 S.E.2d 716 (W. Va. 1959) (finding unreasonable intrusion when a supermarket searched a customer's shopping bag brought from another store, without her consent, on three separate occasions); *Roach v. Harper*, 105 S.E.2d 564 (W. Va. 1958) (finding unreasonable intrusion when a landlord secretly listened to tenants' conversations through the use of a hidden mechanical device).

When Plaintiff reported to the Finish Department office as instructed on March 2, 2007, he was met by Mr. McMellon and Mr. Artrip, Defendant officials, as well as Mr. Preece, a representative from the union.  Plaintiff states that "a couple other people [were] in the office," too, but "they left" when he arrived.  *November 3, 2008 Deposition of James Harbolt*, at 25.  Mr. McMellon told Plaintiff that "he wanted [him] to empty [his] pockets."  *Id*. at 30.  Mr. Preece then asked Mr. McMellon why Plaintiff should do so, to which Mr. McMellon replied "that there [were] allegations . . . that [Plaintiff] was selling prescription medication in the plant."  *Id*. at 31.  Asked at his deposition whether he consented to the search of his pockets, Plaintiff responded "[a]t first, no, I did not consent to it."  *Id*. at 32.  However, he further explained that "after talking to the union rep [Mr. Preece], [he] did go ahead and empty [his] pockets."  *Id.*  Apparently, Mr. Preece had advised Plaintiff, "[I]f you have nothing to hide, you know, just go along with them and all this."  *Id.*  Plaintiff acknowledged that he was "[n]ot physically" forced to empty his pockets, that he was "the one that emptied [his] pockets[,]" and that "[t]hey didn't reach into [his] pockets."  *Id.*  He agreed that he never told Mr. McMellon or Mr. Artrip that he refused to empty his pockets.  He also agreed that he emptied his pockets, at least in part, because he "wanted to show them that [he] had nothing to hide."  *Id.*  Notwithstanding this apparent compliance, Plaintiff argues that he did not consent to the search, because he feels he "really had no choice."  *Id.*

Next, Mr. McMellon and Mr. Artrip informed Plaintiff that "they wanted to go to [his] locker over in the shower room."  *Id.* at 33.  At his deposition, Plaintiff acknowledged that he "consent[ed] to the search of [his] locker," stating, "I was fine with that."  *Id.* at 35.  Like the search of Plaintiff's pockets, the search of his locker revealed no drugs.

Mr. McMellon and Mr. Artrip then told Plaintiff that "they wanted to go to [his] vehicle." *Id*. Plaintiff's vehicle was parked in the parking lot of a credit union, across the street from the mill. As the group walked to the lot, Mr. Preece objected: "Well, you guys can't go through his car. It's over on the parking lot, over on the Credit Union parking lot." *Id*. at 37. However, Mr. McMellon informed Plaintiff and Mr. Preece that Defendant actually owned the lot. Once at Plaintiff's vehicle, Mr. McMellon and Mr. Artrip "asked [Plaintiff] . . . to get in [his] vehicle." *Id*. Plaintiff replied, "No. . . . I don't want you all in my vehicle," but Mr. McMellon insisted: "Yeah, we are going to get in your vehicle, . . . because it is on our property." *Id*. At that point, Plaintiff stated, "If you're looking for my prescriptions that the company doctor gave me yesterday, they're in my arm console thing. . . . Here, I don't want you in my vehicle and tearing it up. I'll get it." *Id*. at 37-38. Plaintiff then reached into his vehicle, got his drugs, and handed them to Mr. McMellon and Mr. Artrip. While Plaintiff was retrieving the drugs, Mr. McMellon apparently searched Plaintiff's trunk, and he may have opened Plaintiff's back door. However, the only drugs recovered were those Plaintiff got from his console.

These facts present a far different situation than the various circumstances, discussed above, under which unreasonable intrusion upon another's seclusion has been found. One key difference is that, in relation to the search of Plaintiff's pockets and locker at least, Plaintiff gave his consent. Although Plaintiff maintains in his brief that he did not consent to the search of his pockets, the record does not support that claim. In his deposition, Plaintiff only states that he did not consent "at first," but that he agreed to empty his pockets after speaking with Mr. Preece, the union representative. *Id*. at 32. He acknowledges that he was "[n]ot physically" forced to empty his pockets, he did not refuse, and, in fact, he "wanted to show [Mr. McMellon and Mr. Artrip] that [he]

had nothing to hide." *Id*. While Plaintiff maintains he did not give his consent because he felt he "really had no choice," what Plaintiff really alleges here is that he faced a choice between two undesirable options. *Id*. Although Plaintiff may have been terminated, he could have refused to consent to the search, notwithstanding his assertions to the contrary.

To the extent that Mr. McMellon searched Plaintiff's vehicle, it appears that Plaintiff did not consent. However, Mr. McMellon's acts were wholly unlike, for example, a person entering the residence of another over that person's objections. *See* RESTATEMENT (SECOND) OF TORTS § 652B cmt. b. Plaintiff had been accused of selling drugs on company property. His car was parked on company property. The investigation was not into his "private affairs or concerns," but rather dealt with an issue closely linked to workplace safety. *Id*. § 652B. The search of Plaintiff's car under these circumstances, even without his consent, would not "be highly offensive to a reasonable person." *Id*. For these reasons, summary judgment should be granted.


### D. Defamation

In West Virginia, "[t]he essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. pt. 1, *Crump*, 320 S.E.2d 70. Plaintiff initially based his claim for defamation on the statements of Mr. Groff made in his termination letter and during the grievance and arbitration proceedings. *See November 3, 2008 Deposition of James Harbolt*, at 114-117. However, Plaintiff has since abandoned that basis for his claim, and now alleges that Mr. McMellon defamed him when, "prior to [his] suspension and termination," Mr. McMellon stated in the presence of Mr.

Artrip and Mr. Preece "that plaintiff sold drugs to [a co-worker]." *Plaintiff's Memorandum in Support of Opposition*, at 11. However, Plaintiff's newfound reliance on Mr. McMellon's statement is misplaced for at least two reasons.

First, the statement was not false. In his response, Plaintiff claims Mr. McMellon stated that "plaintiff sold drugs" to a co-worker. *Id*. However, the record does not bear out Plaintiff's assertion. In his deposition, Plaintiff testified that, when he entered the mill office and found Mr. McMellon, Mr. Artrip, and Mr. Preece there, Mr. Preece asked "what was going on," to which Mr. McMellon replied, "that there [were] *allegations* . . . that [Plaintiff] was selling prescription medication in the plant." *See November 3, 2008 Deposition of James Harbolt*, at 31 (emphasis added). Defendant has submitted both a signed, written statement and a sworn, notarized affidavit from Plaintiff's accuser, alleging that Plaintiff previously sold him pain pills. Plaintiff has never contested that there were not *allegations* that he had sold drugs on company property. Therefore, Mr. McMellon's statement was true.

Second, Mr. McMellon's statement was not "a nonprivileged communication to a third party." Syl. pt. 1, *Crump*, 320 S.E.2d 70. "A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." *Id*. at 78. (quoting *Mauck v. Martinsburg*, 280 S.E.2d 216, 221 (W. Va. 1981)). Such privileges "usually extend[] to employer-employee relations." *Mauck*, 280 S.E.2d at 221. In determining whether the privilege applies, courts "focus[] on whether the communication dealt with facts 'which affect a sufficiently important interest of the publisher' and whether 'the recipient's knowledge of the

-27-

defamatory matter will be of service in the lawful protection of the interest.'" *Id*. (quoting *Parker v. Appalachian Elec. Power Co.*, 30 S.E.2d 1, 4 (W. Va. 1944)).

In this case, Mr. McMellon's statement dealt with the reason for the investigation of Plaintiff, which surely was of "sufficiently important interest" to both Plaintiff and Defendant.  *Id*. Moreover, although not entirely clear from the record and the briefings, it appears that Mr. Preece's presence was obtained so that Plaintiff would have the benefit of his counsel during the investigation or, at a minimum, a witness present who was not a company official.  In any event, Mr. McMellon's statement to Mr. Preece regarding the basis for his request that Plaintiff empty his pockets appears to have been "of service in the lawful protection" of Defendant's interest, as well as in the interest of Plaintiff, in that it provided his union representative and him an explanation for the investigation. *Id*.  Along these lines, the statement was made only "to those persons who ha[d] a legitimate interest in the subject matter[:]" Plaintiff, another Defendant official participating in the investigation (Mr. Artrip), and Plaintiff's union representative (Mr. Preece).  Syl. pt. 1, *Crump*, 320 S.E.2d 70. Tellingly, aside from baldly asserting that the statement was "not privileged," Plaintiff makes no effort to explain *why* a qualified privilege does not apply under these circumstances.  *See id*. at 78 (listing five requirements which must be met to overcome a qualified privilege).  Accordingly, summary judgment is granted.

## IV. CONCLUSION

Pending before the Court are Defendant Steel of West Virginia, Inc.'s Motion for Summary Judgment (doc. 41) and Motion to Strike (doc. 72).  For the foregoing reasons, the Court **GRANTS** the Motion for Summary Judgment and **DENIES as moot** the Motion to Strike.

ENTER: July 6, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE